**Katherine TRAHARNE, Administrator of the Estate of Kenneth William Traharne, Deceased, Plaintiff,**

v.

**WAYNE SCOTT FETZER COMPANY, Defendant.**

**No. 97 C 4111.**

United States District Court, N.D. Illinois, Eastern Division.

June 11, 2001.

---

Craig Edgar Anderson, Jacobsen, Brandvik & Anderson, Chicago, IL, Joseph E. Tighe, Joseph E. Tighe, P.C., Chicago, IL, for Plaintiff.

John Robert Doyle, McDermott, Will & Emery, Chicago, IL, Michael Anthony Glackin, Foley & Lardner, Chicago, IL, for Defendant.

### MEMORANDUM OPINION AND ORDER

GUZMAN, District Judge.

This matter is before the Court on plaintiff Katherine Traharne's objections to Magistrate Judge Thomas Rosemond's Order granting defendant's motion to bar testimony of plaintiff's expert Greg Kaplan ("Kaplan"), and both parties' objections to Magistrate Judge Rosemond's Order granting in part and denying in part defendant's motion to bar testimony of plaintiff's expert Michael Morse ("Morse"). For the reasons set forth below, the Court rejects plaintiff's objections and accepts Judge Rosemond's findings with respect to the testimony of Greg Kaplan, and the Court rejects both parties' objections and accept

Judge Rosemond's findings with respect to the testimony of Michael Morse.

### I. Defendant's Motion to Bar Testimony of Greg Kaplan

■ A magistrate judge's ruling on a non-dispositive matter may only be reversed on a finding that the order is clearly erroneous or contrary to law. Fed. R.Civ.P. 72(a). Pretrial motions are considered non-dispositive of litigation and are reviewed by the district court under the more lenient clearly erroneous standard. *United States v. Premises Known As 281 Syosset Woodbury Road,* 862 F.Supp. 847, 851 (E.D.N.Y.1994), *aff'd,* 71 F.3d 1067 (2d Cir.1995). "A finding is clearly erroneous when although there is enough evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

Plaintiff, as administrator of her deceased brother's estate, filed a products liability action against defendant, a manufacturer of a submersible pump, charging that the pump was negligently designed and that the negligent design caused the death of her brother. The tragic accident took place on June 13, 1995 when plaintiff's brother suffered a fatal electric shock while attempting to use a sump pump to drain rainwater from a swimming pool.

Plaintiff pursues two theories of liability: 1) negligent manufacture of the submersible pump; and 2) defectively design of the submersible pump. With respect to the second theory of liability, plaintiff asserts that there should have been a supplemental restraint system on the pump to protect against the possibility that the pump's strain relief clamp would fail and allow water to enter the pump, become electrified, and expose an individual using the

pump to electric shock. To bolster this theory plaintiff hired Kaplan to design such a supplemental restraint system for the pump and provide a cost estimate for the manufacturing and shipping of the new part. Kaplan is the owner and president of K&C Machining, Inc., a precision machining company specializing in the production of close tolerance aluminum and high-alloy components for aerospace defense systems and telecommunications. Plaintiff offered Kaplan as an occurrence witness because he participated in the design of the proposed supplemental restraint. Kaplan was prepared to testify that the proposed supplemental restraint designed by him could be manufactured at a cost of fifteen cents per unit. Prior to trial defendant sought to bar Kaplan's expert testimony challenging his credentials and opinion.

■ Plaintiff objects to the characterization of Kaplan as an expert and to the characterization of his testimony as an "opinion." Instead, plaintiff suggests that the process used by Kaplan to design the supplemental restraint is factual testimony and Kaplan is an occurrence witness. This Court rejects plaintiff's assertions that Kaplan is an occurrence witness. Kaplan never examined any of the case materials or even the pump's existing strain relief clamp. Kaplan created an alternative design with an additional supplemental restraint system, testified that it would cost only fifteen cents per unit to manufacture this supplemental restraint, and plaintiff intends to use this alternative design as the standard to which defendant's pump should have conformed. Only Kaplan has the ability to testify about the alternative design. The purpose of the alternative design evidence and Kaplan's testimony is to allow the jury to compare the adequacy of defendant's design with Kaplan's and come to the conclusion that Kaplan's de-

sign significantly reduces the risk of an electrocution accident with only minimal additional costs. Therefore, Kaplan is being tendered as a design engineering expert witness and a cost-benefit analysis expert and this Court will view him as such.

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. Fed.R.Evid. 702.

■ A witness may offer an expert opinion only when he or she draws on specialized "knowledge, skill, experience, training or education." *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 723 (7th Cir.1999), *cert. denied*, 529 U.S. 1067, 120 S.Ct. 1673, 146 L.Ed.2d 482 (2000). To determine if a witness qualifies as an expert a court should compare the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness' testimony. *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990).

■ In addition to being a qualified expert, the subject of the witness' testimony must be scientific knowledge. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *Daubert* further suggests that proposed expert testimony must be derived by the scientific method and must assist the trier of fact in understanding or determining a fact in issue in the case. *Id.* at 590–91, 113 S.Ct. 2786. Therefore, when faced with the proffer of expert testimony a court must undertake a two-prong analysis. First, the court must consider

whether the proffered testimony has been subjected to the scientific method, and second whether the testimony will assist the trier of fact in understanding evidence or determining a fact in issue. *Deimber v. Cincinnati Sub–Zero Prods., Inc.,* 58 F.3d 341, 344 (7th Cir.1995).

■ This Court agrees with Magistrate Judge Rosemond's finding that Kaplan was not qualified as an expert and his testimony was not derived by the scientific method and would not assist the trier of fact in determining a fact in issue in this case.

Kaplan does not have any engineering design or physics degrees and has had no training in mechanical or electrical engineering. Kaplan, in fact, is not even a college graduate. He completed two years of general studies at the University of Illinois. Kaplan has not published or lectured on any subject involving sump pump design or safety. Kaplan also has no experience or familiarity with the sump pump manufacturing industry. He has never before designed a sump pump or a sump pump strain relief system.

Even more troubling than Kaplan's lack of qualifications are the methods he used to reach his conclusions. Kaplan did not evaluate defendant's sump pump to determine what caused the pump's strain relief mechanism to fail. Kaplan even admitted that "he was retained to make a clamp. He was not brought into the case to evaluate ... the existing unit." (J. Rosemond's Order at 6.) Therefore, Kaplan's analysis assumed that the existing strain relief mechanism was defective. However, the precise issue in this case was whether the existing strain relief clamp was defective and if Kaplan's testimony is based on the assumption that it was, then he will obviously not aid the jury in determining the issue involved in this case.

After Kaplan designed his strain relief clamp, he did not validate it through accepted scientific testing methods and procedures. Magistrate Judge Rosemond made the following findings regarding Kaplan's "test":

Mr. Kaplan tested the design by dropping the sump pump ten or more times "from a height greater than two feet ...." In other words, he held the sump pump by the power cord and let three feet of cord slip through his hand as the unit dropped. This "test" revealed no movement of his designed clamp. In other words, Mr. Kaplan's design pulled all external forces away from the watertight seal.

(*Id.* at 7.) Kaplan's study was not based on commonly accepted scientific testing procedures and analysis. His "test" and conclusions, according to this Court, are too simple and unsubstantiated to be considered reliable. He also did not conduct similar tests on defendant's sump pump.

Another component of Kaplan's testimony was his analysis that an alternative strain relief mechanism could be installed with minimal costs to the defendant. Again this testimony was out of the realm of Kaplan's expertise. Kaplan is the President and Owner of K&C Machining, Inc., a precision machining company. He has no specialized training, education, or experience that would qualify him as a cost analysis expert. Magistrate Judge Rosemond held that "holding the status of Chief Executive Officer of a successful business enterprise does not in and of itself make an individual a cost estimate or cost analysis expert. His knowledge and experience is perforce limited to that of his own company." (*Id.* at 8.) Kaplan based his cost analysis on the "per unit" manufacturing costs of his own business but never offered any explanation or conducted any research regarding the relationship

between his company's costs and defendant's. His cost analysis, based on his own company, is therefore unreliable and irrelevant.

In addition to his lack of qualifications and unreliable methodology, there were other problems with Kaplan's proposed testimony. Magistrate Judge Rosemond concluded with the following analysis:

> Finally, it must be noted that much too much of the unusual surrounds Mr. Kaplan and his assigned task for this case. It is unclear as to whether or not he has ever billed plaintiff's counsel for his services. The amount of hours expended by him in "designing" and "testing" his strain relief device is less than 30 hours. Mr. Kaplan did not prepare his own report. Plaintiff's counsel prepared the report and presented it to Mr. Kaplan for signature. The ostensible non-reliability of Mr. Kaplan's report and the opinions expressed therein severely taint his status as a qualified expert. The manner in which his expert report was prepared seriously undermines his ability to speak authoritatively about how power cords for submersible pumps should be safeguarded against misuse, or how his design safeguards against misuse. The flaws in his report preparation, the gratuitous nature of his services, and the minuscule amount of time expended in analysis, testing, and thought impact more than the weight to be given his testimony and opinions. They impinge upon his qualifications as an expert.

(*Id.* at 15–16.) Kaplan's testimony essentially involves either evidence that he is not qualified to have an opinion on or evidence derived from tests that are suspect in their scientific accuracy. Therefore, this Court must agree that his testimony will not assist the jury in determining any issue in this case. For the foregoing reasons, Magistrate Judge Rosemond's Order granting Defendant's Motion to Bar the Testimony of Greg Kaplan is affirmed.

## II. Defendant's Motion to Bar Testimony of Michael Morse

Magistrate Judge Rosemond essentially denied defendant's motion to bar the testimony of plaintiff's expert Michael Morse except for the portion of Morse's testimony referring to Kaplan's alternatively designed pump based on the fact that Kaplan's pump and testimony are not admissible.

Determining admissibility of expert testimony under Federal Rule of Evidence 702 is a two-prong analysis. The first prong states that "a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify as to matters involving scientific, technical, or other specialized knowledge." Fed. R.Evid. 702. The second prong of Federal Rule of Evidence 702 requires that the evidence being testified to will "assist the trier of fact in understanding the evidence or determining a fact in issue." *Porter v. Whitehall Labs. Inc.*, 9 F.3d 607, 614 (7th Cir.1993).

With respect to the first prong, Morse's expert qualifications, Magistrate Judge Rosemond found the following:

> Dr. Michael S. Morse is an Associate Professor of Electrical Engineering at the University of San Diego in California. He has a doctorate in Engineering from Clemson University in Clemson, South Carolina; a Master of Science and a Bachelor of Science from Tulane University in New Orleans, Louisiana; and a law degree from the University of San Diego. He is a member of several honorary societies, such as H.K.N., an Electrical Engineering Honor Society; Sig-

ma Xi, a research Honor Society; and Tau Beta Pi, an Engineering Society.

Dr. Morse has expertise in "electrical shock injury, electrical safety, electrical injury, effects of electricity on the human body, failure at the human/machine interface, and biomedical device failure (electro-mechanical)." Dr. Morse has been a consultant in "several electric shock injury, electrocution, and electrical safety cases." He has also been a consultant in "medical products failure cases involving electropapillotome, infusion pump, and thermal blanket."

Dr. Morse has been a prolific writer with over 20 papers and publications to his credit. Not all of his published works have been in the area of electric shock injury, however.

Dr. Morse has qualified and testified as an expert witness in several federal and state courts. He qualified as both a Biomedical and Electrical Engineering expert in the United States District Court for the Middle District of Florida, and testified on the subject of "Electrical Technology." In the United States District Court for the Eastern District of Louisiana, Dr. Morse qualified as an expert witness on "the effects of electricity on the human body." In other federal and state courts, Dr. Morse has testified regarding 1) electrical product failure and resultant injury from an electrical connector, 2) electrical injury incurred while installing traffic lights, 3) injury from an electric arc, 4) electrical contact with overhead power lines, 5) the effects of electricity on the human body with regard to pain and suffering; and 6) the failure of a "man-lift" with emphasis on design, human factors and electrical circuitry.

(J. Rosemond's Order at 11–13.) With all of his education and experience it is clear that Morse is a qualified expert on the subject of electrical accidents. Indeed, defendant does not challenge Morse's testimony based on lack of qualifications. Defendant challenges Morse's scientific methodology and lack of time spent and research conducted in reaching his conclusions. Defendant contends:

> Morse reached his opinions after spending only four hours reviewing documents in his office in San Diego. He did not inspect the sump pump or the short circuited extension cord involved in the decedent's accident. He did not review the Packer photographs and, in fact, was unaware that they even existed. Morse performed no testing, research, calculations, experiments, or analysis of any kind. In fact, he spent more time actually drafting his report (4.5 hours) than he did developing his expansive opinions.

(Def.'s Mem. Supp. Mot. Bar Test. Michael Morse at 4–5.)

The court must determine whether the proposed expert testimony pertains to scientific, technical or other specialized knowledge. Fed.R.Evid. 702. An expert's opinion must therefore be predicated on valid reasoning based on what is known, and supported by reliable methodology. *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806–07 (3d Cir. 1997). It is not the court's duty to deny the admission of evidence because of factual inaccuracies and the court should only exclude the evidence if the expert is without sufficient grounds for his conclusion. *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 746 (3d Cir.1994). Factual inaccuracies are to be explored through cross-examination and go toward the weight and credibility of the evidence not admissibility. *See generally Walker v. Soo Line R.R. Co.,* 208 F.3d 581, 586–89 (7th Cir.), *cert denied,* 531 U.S. 930, 121 S.Ct. 311, 148 L.Ed.2d 250 (2000).

Defendant's main objections to Morse's testimony center around the short amount of time he spent studying the facts and documents in the case and the fact that he never personally examined the sump pump at issue. Although these are valid objections this Court believes that they are better explored on cross-examination. First, there is no requirement that an expert "personally perceive the subject of his analysis." *NutraSweet Co. v. X–L Eng'g Corp.*, 227 F.3d 776, 789 (7th Cir. 2000). Also, "shaky" expert testimony and testimony with a weak factual basis is better revealed through cross-examination and it is not an abuse of discretion to admit such testimony. *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786; *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549 (D.C.Cir. 1993).

Morse has offered essentially three main opinions in this case: 1) the design of defendant's CDU 800 sump pump is defective in that the strain relief mechanism is inadequate to secure the power cord in the watertight seal during "foreseeable" uses of the pump; 2) the breach of the watertight seal was what caused the electrocution at issue in this case; and 3) the decedent experienced considerable, tremendous, horrific pain as well as other extreme effects brought on by the electric shock including "neural stimulation" and "muscle contractions."

With respect to Morse's first opinion, he contends that a second safety measure on the submersible pump would have protected against the risk that the pump's power cord would disengage from the pump so that there would be a breach in the water tight seal and allow water to enter the pump while it was in operation. His opinion, although not based on examination of the pump, was based on documents given to him, his experience, specialized knowledge, academic training, and observations and research he has previously conducted with respect to his previous experience testifying in similar trials. Defendant's insistence that Morse's conclusions are speculative simply because he did not examine the specific pump is misplaced. If Morse's conclusions are incorrect and his analysis is flawed, then it will be defendant's job to bring this out on cross-examination. However, it does not affect admissibility. *See In re Paoli R.R. Yard PCB Litigation*, 35 F.3d at 746.

Defendant next contends that Morse's opinion regarding causation is unreliable because he "failed to consider an obvious alternative cause of the decedent's electrocution—the short circuit in the extension cord." (J. Rosemond's Order at 25.) In fact, as Magistrate Judge Rosemond points out, Morse did consider the short circuit in the extension cord. *See id.* Furthermore, even if Morse was mistaken about a particular fact that again goes toward the evidence's weight and not its admissibility. (*See id.* at 26.)

Morse also provides testimony suggesting supplemental restraint design modifications and suggests that a ground fault circuit interrupter could have prevented the accident in this case. Magistrate Judge Rosemond pointed out several problems with this testimony. (*See id.* at 39, 40 ("Although he believes that a ground fault circuit interrupter should have been a part of the sump pump design, Dr. Morse performed no analyses of the feasibility or cost-effectiveness of incorporating this device into the defendant's Wayne Model CDU 800 sump pump.")) Magistrate Judge Rosemond concluded that although there are some problems with Morse's testimony his conclusions should be best analyzed by a jury. (*See id.* at 40.)

This Court agrees that *Daubert*'s deferential standard and Morse's extensive experience analyzing these types of acci-

dents mandates admissibility of his testimony. If this Court were to bar Morse's testimony simply because it felt that he did not observe proper methods while reviewing the sump pump, then this Court would be placing itself in the position of determining admissibility based on the Court's opinion that is conclusions are flawed. *Daubert* does not permit the Court to do this. If this highly qualified expert came to a flawed conclusion, then it is defendant's job to bring that out through cross-examination.

■ Finally, Morse's opinion that the decedent suffered ventricular fibrillation as a result of an electric current that passed through his heart and suffered a significant amount of pain and suffering is admissible. Defendant challenges these opinions as ignorant of the facts of the case. Again, however, Morse's opinions were based on his vast experience and education. In fact, with respect to these two opinions, Dr. Morse's experience in previous trials testifying to these exact matters suggests an even greater justification for admissibility. Therefore, Magistrate Judge Rosemond's Order denying in part and granting in part Defendant's motion to exclude the testimony of Dr. Morse is affirmed.

### Conclusion

For the foregoing reasons, the Court affirms and adopts Magistrate Judge Thomas Rosemond's orders granting defendant's motion to bar testimony of plaintiff's expert Greg Kaplan [docket no. 51–1] and granting in part and denying in part defendant's motion to bar testimony of plaintiff's expert Michael Morse [docket no. 52–1].

**SO ORDERED**

### *ORDER*

ROSEMOND, United States Magistrate Judge.

Before the Court is *"Defendant's Motion To Bar The Testimony Of Greg Kaplan"*. **The motion is granted.**

The underlying action arises out of the electrocution death of a 15–year old boy who died while using a submersible pump manufactured by the defendant to remove accumulated rain water from an above ground swimming pool in his backyard. The product involved is a Wayne Model CDU 800 sump pump. The pump has an electric motor that is contained inside the metal body or "case" of the sump pump. Affixed to the top of the pump case is a switch housing, which is made of nonconductive plastic. It houses the two connection terminals for the electric motor (the "hot" and the neutral), as well as the ground terminal which is connected to the metal case of the sump pump. The sump pump's power cord, which connects the electric motor to an external power source, enters the pump through a seal arrangement in the top of the switch housing. The seal is formed by a rubber grommet[1] which surrounds and fits tightly against the outer sheath of the power cord. Inside the switch housing, the sheath of the power cord terminates, exposing the individually insulated lead wires of the power cord. These lead wires, consisting of the "hot" wire, the neutral wire and the ground wire, connect to the two motor terminals and the ground terminal inside the switch housing.

---

1. A grommet is described as a flexible loop that serves as a fastening, support or reinforcement. It is also described as an eyelet of firm material to strengthen or protect an opening or to insulate or protect something passed through it. *Merriam–Webster's Collegiate Dictionary,* at 514 (10th ed. 1996).

The power cord is secured in the seal by means of a strain relief clamp. This clamp is crimped[2] tightly onto the sheath of the power cord in the assembly process. Because the outside diameter of the strain relief clamp is larger than the inside diameter of the hole in the rubber grommet through which the power cord enters the switch housing, the clamp prevents the power cord from being pulled out through the seal and allowing water to enter the switch housing.

The accident that is the subject of this litigation occurred on June 13, 1995. At that time, the plaintiff's decedent was using the sump pump to drain approximately 6 to 8 inches of water from a swimming pool in his backyard. Two days after the accident, on June 15, 1995, as part of its cause of death investigation, the McHenry County Sheriff's Office delivered the sump pump to Packer Engineering ("Packer"), an independent engineering firm, for analysis. Packer carefully inspected, photographed and documented the condition of the sump pump and prepared a written report of its findings. Packer's photographs show that the power cord of the sump pump was pulled out of the watertight seal past the point where the outer sheath of the power cord terminates. This resulted in the three inner lead wires of the power cord, which are normally located inside the switch housing, being pulled up through the watertight seal. This, in turn, created a ⅟₁₆th inch gap in the watertight seal, which allowed water to enter the switch housing. The Packer photographs show that there is no strain relief clamp either on the sheath of the power cord or inside the sealed switch housing. Significantly, the water from the decedent's swimming pool was still inside the switch housing when Packer first unscrewed the cover, indicating that the switch housing had remained screwed in place from the time of the accident until the time of Packer's inspection.

Although the Packer photographs show that the strain relief clamp was absent from the power cord and the switch housing, the photographs show distinct marks on the sheath of the power cord in the location where the clamp was supposed to be. These marks correspond precisely to the points around the circumference of the power cord to which a properly crimped strain relief clamp would apply pressure.

Pursuant to plaintiff's *Second Amended Complaint*, plaintiff pursues two theories of liability, *to-wit:* negligent manufacture of the submersible pump and a defectively designed submersible pump. With respect to plaintiff's assertion that the pump was defectively designed, plaintiff charges that there should have been a supplemental restraint system in place on the pump. Plaintiff maintains that such a supplemental restraint system would have protected against the possibility that users, carrying the pump by the cord, would apply pressure on the strain relief claim and might, ultimately, cause the strain relief clamp to fail, thereby allowing the power cord to be pulled out of the pump's housing while still attached to the pump's motor. Under such circumstances, argues the plaintiff, water would enter the pump, become electrified, and any individual exposed to that electrical force could suffer a fatal electrical shock.

Plaintiff's counsel hired Mr. Greg Kaplan to devise and fabricate a supplemental restraint for the exterior of the sump pump at issue and to provide an estimate

---

**2.** Generally speaking, crimp means to cause to become wavy, bent, or pinched. In the context of this case, it appears to mean to pinch or press together. *Merriam–Webster's Collegiate Dictionary,* at 275 (10th ed. 1996).

of the cost for manufacturing and shipping such a part. Plaintiff's counsel views Mr. Kaplan as an occurrence witness based on Mr. Kaplan's participation in the design and creation of plaintiff's proposed supplemental restraint device. Mr. Kaplan will offer an opinion that the prototype designed by him can be manufactured at a cost of less than 15¢ per unit. Defendant challenges Mr. Kaplan's credentials and his opinions.

At the outset, we must reject the contention that Mr. Kaplan is an occurrence witness. He is being tendered as an expert witness and we shall view him as such.

Mr. Greg Kaplan is not a design engineering expert. He is a machinist, social friend, and sailing buddy of plaintiff's counsel and the owner and president of K&C Machining, Inc., a precision machining company. Mr. Kaplan's company specializes in the production of close-tolerance aluminum and high-alloy components for aerospace, defense systems and telecommunications. Over the years, Mr. Kaplan has designed products for a number of companies, such as AT&T, Lucent Technologies, and Parker Hannifin, to name a few. Mr. Kaplan also has some expertise in yachting and boat design. In addition, Mr. Kaplan has designed and developed automotive products for racing cars.

Mr. Kaplan has no educational degrees in the area of engineering design or physics. He has no education or training in the areas of electrical or mechanical engineering. In fact, he is not a college graduate.[3]

He has only two years of general college studies at the University of Illinois.

Mr. Kaplan has no experience in or familiarity with the sump pump design or manufacturing industry. He has never designed a sump pump or a sump pump strain relief system, device, or clamp before being asked to do so for this case. He has not published any articles on the subject of sump pump design in general or sump pump strain relief clamps or mechanisms in particular.[4] Mr. Kaplan is not, nor does he profess to be, an expert on how strain relief mechanisms for sump pumps should be designed. Nor has he ever testified on this subject in a court of law.

Mr. Kaplan did not evaluate defendant's sump pump design to determine what caused the pump's strain relief mechanism to fail as alleged by plaintiff. Nor did he conduct any engineering analysis of the defendant's design of the CDU 800 sump pump. *As Mr. Kaplan himself states, he was retained "to make a clamp. [He] was not brought [into] [the case] to evaluate ... the existing unit."*[5] In other words, Mr. Kaplan's designs, opinions, analyses, and cost estimates are predicated *solely* on the assumption—unchallenged by him—that the defendant's Wayne Model CDU 800 sump pump strain relief clamp was defective and was in need of "fixin".

Mr. Kaplan did develop an alternative design for the strain relief clamp, but offers no feasibility studies for the design. Mr. Kaplan designed "a secondary cord restraint that would take any kind of forces off th[e] initial grommet connec-

3. Transcript of the August 20, 1999 deposition of Gregory R. Kaplan, at 727, *attached as Exhibit A to, "Memorandum In Support Of Defendant's Motion To Bar The Testimony Of Gregory Kaplan."*

4. Exhibit A, at 18.

5. Transcript of the November 22, 1999 deposition of Gregory R. Kaplan, at 22, *attached as Exhibit B to, "Memorandum In Support Of Defendant's Motion To Bar The Testimony Of Gregory Kaplan"* (emphasis added).

tion."[6] However, he did not validate his design through commonly accepted scientific testing procedures and analysis. After installing his designed clamp, Mr. Kaplan tested the design by dropping the sump pump ten or more times "from a height greater than two feet..."[7] In other words, he held the sump pump by the power cord and let three feet of cord slip through his hand as the unit dropped.[8] This "test" of his revealed no movement of his designed clamp.[9] In other words, Mr. Kaplan's design pulled all external forces away from the watertight seal.[10]

In designing an alternative strain relief clamp or device, Mr. Kaplan's goal was "to build something that required no additional modification to the [sump pump] unit [at issue]."[11] His second goal was to "come up with a component that would be as cost effective as possible."[12] In this regard, he predicated his analysis on the manufacturing and supply costs that would be generated by his company, if it were to make and ship the sump pump as re-designed by him. He did no labor cost surveys or investigation regarding the defendant's sump pump assembly line costs or its supply costs.[13]

There is nothing in the record showing that Mr. Kaplan has any specialized training, education, or experience that would make him a cost estimate or cost analysis expert. He is a businessman. Presumably, his company is profitable. However,

holding the status of Chief Executive Officer of a successful business enterprise does not in and of itself make an individual a cost estimate or cost analysis expert. His knowledge and experience is perforce limited to that of his own company. This limitation makes him an expert with respect to his company and no more.

Mr. Kaplan believes that his alternative design will "relieve strain from the actual sealing part of the cord housing unit."[14] His design is predicated on "taking simple things that [he] learned in sailing, and ... applying them to this ... [situation]."[15]

***Rule 702 of the Federal Rules of Evidence sets the standard governing the admissibility of expert testimony.*** Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.[16]

Under Rule 702, Mr. Kaplan may offer an expert opinion only if he draws on some specialized "knowledge, skill, experience, training, or education to formulate that opinion."[17] Additionally, the opinion must be an expert opinion, that is, an opinion predicated upon the witness' expertise, rather than simply an opinion proffered by

---

6. Exhibit B, at 23.

7. Exhibit B, at 23.

8. Exhibit B, at 24.

9. Exhibit B, at 23.

10. Exhibit B, at 23.

11. Exhibit B, at 16.

12. Exhibit B, at 18.

13. Exhibit B, at 39.

14. Exhibit B, at 18.

15. Exhibit B, at 20.

16. Rule 702, *Federal Rules of Evidence,* 28 U.S.C.A.

17. *Jones v. Lincoln Elec. Co.,* 188 F.3d 709, 723 (7th Cir.1999).

a purported expert.[18] Whether or not a witness qualifies as an expert is to be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness' testimony.[19]

*The subject of an expert witness' testimony must be "scientific knowledge."*[20] Expert testimony must be "derived by the scientific method" and must "fit" the case.[21] In other words, it must assist the trier of fact in understanding the issues.[22]

*Established decisional law dictates that when confronted with a proffer of expert testimony, a trial court must undertake a two-step analysis.* First, the district court must determine whether the proffered expert testimony has been subjected to the scientific method. In other words, the trial court must rule out subjective belief or unsupported speculation.[23] Second, the district court must determine whether the proffered evidence or testimony will assist the trier of fact in understanding the evidence or in determining a fact at issue.[24] Accordingly, we must view Mr. Kaplan's testimony within the parameters of these standards and guidelines.

*No evidence has been presented demonstrating that Mr. Kaplan is qualified as an expert by way of "knowledge, skill, experience, training or education."* Mr. Kaplan is a high school graduate with no experience in machine design, electrical engineering, or product safety. No showing has been made that Mr. Kaplan has ever been involved in the design or testing of electrical appliances or consumer products. He has never published or lectured on the subject of product design or safety. His area of expertise appears to be as a machinist, entrepreneur, and Chief Executive Officer of his own company. No effort has been made to show how his experience and expertise relate to the design of sump pump power cord strain relief devices.

*Nor can it be said that Mr. Kaplan possesses the special skill, knowledge, or experience to estimate the purported costs that defendant Wayne Scott Fetzer Company would incur to incorporate his clamp design into its sump pump.* Indeed, Mr. Kaplan admits that he has never been asked to perform such estimates or costs calculations for any of his customers. This lawsuit will be the first occasion that Mr. Kaplan has ever attempted the type of cost analysis that he now proffers as an expert opinion. That being the case, it can not be said that Mr. Kaplan has extensive hands-on experience gleaned over a meaningful period of time during which he developed a working expertise in a discrete subject or area of knowledge.

Mr. Kaplan offers no opinion regarding whether or not his strain relief device complies with the public safety standards of Underwriters Laboratories Inc.[25] Underwriters Laboratories Inc. was founded in

---

**18.** *United States v. Benson,* 941 F.2d 598, 604 (7th Cir.1991).

**19.** *Carroll v. Otis Elevator Co.,* 896 F.2d 210, 212 (7th Cir.1990).

**20.** Rule 702 of the *Federal Rules of Evidence; Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993).

**21.** *Daubert,* 509 U.S. at 590–91, 113 S.Ct. at 2795–96.

**22.** *Id.*

**23.** *Deimber v. Cincinnati Sub–Zero Prods., Inc.,* 58 F.3d 341, 344 (7th Cir.1995).

**24.** *Id.*

**25.** *See generally,* Exhibit D ("UL"), *"Memorandum In Support Of Defendant's Motion To Bar The Testimony Of Michael Morse".*

1894 as a not-for-profit organization to establish, maintain, and operate laboratories for the examination and testing of devices, systems and materials to determine their relation to hazards to life and property, and to ascertain, define and publish standards, classifications and specifications for materials, devices, products, equipment, constructions, method, and systems affecting such hazards.[26]

According to the defendant "[i]t is ... undisputed that [the Underwriters Laboratories'] independent testing of [its] sump pumps over the years has shown that in every instance, the strain relief clamp met and exceeded UL performance standards".[27] Underwriters Laboratories' standards require strain relief mechanisms like the defendant's to withstand 35 lbs. of tensile force applied for 60 seconds.[28] Mr Kaplan offers no opinion regarding whether this standard is appropriate or inappropriate. It strikes us that Mr. Kaplan cannot offer an opinion on the soundness of his design without referencing the Underwriters Laboratories' standards. His failure to do so severely lessens the validity and authenticity of his opinions and his strain relief device.

***Mr. Kaplan's opinion is not derived from any scientific methodology.*** He performed no scientific testing or analysis whatsoever of the existing strain relief design. In performing his assigned analysis, he was asked to assume that the design of the CDU 800 sump pump at issue was inadequate and to develop a supplemental more cost effective strain relief device for the pump.

The difficulty with Mr. Kaplan's opinions is that in reaching these opinions he conducted virtually no investigation, research, study, testing, calculations, or analysis of any kind. His "drop" test of his clamp prototype strikes us as being too elementary and superficial to be scientifically reliable. And, using one's own company for investigation, research, study and calculations strikes us as using a wholly irrelevant medium for comparison purposes. The rationale for using Kaplan's company for cost estimates and other comparisons instead of the defendant's business is never proffered.

In designing and developing his supplemental strain relief device, Mr. Kaplan did not examine the defendant's Wayne Model CDU 800 sump pump, which is at issue. He reviewed no engineering drawings or specifications for the CDU 800 sump pump. He never examined the strain relief clamp of the CDU 800 sump pump to determine wherein it was defective. Rather, he assumed that the defendant's strain relief clamp design was defective. This assumption on his part flaws his own analysis and design, because he is not in a position to reliably state why his design is an improvement over the defendant's original design. In a sense, Mr. Kaplan's strain relief design "arises out of the blue", and no effort is made to tie it in with the defendant's strain relief design or the defendant's sump pump.

Finally, Mr. Kaplan has not read any of the depositions in this case or any other case materials. Consequently, he can not speak to whether or not his strain relief design would have had any impact on the

**26.** Exhibit D ("UL").

**27.** *"Reply Brief In Support Of Defendant's Motion To Bar The Testimony Of Gregory Kaplan"*, at 726.

**28.** *Id.*

accident *sub judice.* Such being the case, Mr. Kaplan's opinions would not be probative of any issue in the case. Nor would they assist the trier of fact in determining any issue in the case. His cost per unit estimates are completely irrelevant if his strain relief design is not suitable, appropriate, safe, or feasible. And, Mr. Kaplan cannot speak to these matters if he cannot compare his device with the original Wayne Model CDU 800 sump pump and articulate wherein it is defective and his design an improvement. Plaintiff has not carried her burden in demonstrating that these omissions and flaws can be cured by the use of an independent design expert.

*Mr. Kaplan's cost estimates are unscientific and unsupported.* As noted earlier, Mr. Kaplan based his cost analysis and estimates on the "per unit" manufacturing costs of his own business. In other words, he assumed that the manufacturing costs of the defendant were the same or comparable to those of his own company. Accordingly, Mr. Kaplan's cost analysis has no relationship to the defendant's manpower costs or manufacturing costs. His cost estimates and cost analysis is based *solely* on manpower costs, manufacturing, supply, and shipping costs which are not probative of the defendant's such costs and, therefore, are wholly irrelevant to any issue in the case. No effort is made by Mr. Kaplan to explain why his company's overhead or manufacturing and shipping costs would be relevant to the defendant's costs.

Finally, it must be noted that much too much of the unusual surrounds Mr. Kaplan and his assigned task for this case. It is unclear as to whether or not he has ever billed plaintiff's counsel for his services.

The amount of hours expended by him in "designing" and "testing" his strain relief device is less than 30 hours. Mr. Kaplan did not prepare his own report. Plaintiff's counsel prepared the report and presented it to Mr. Kaplan for signature.[29] The ostensible non-reliability of Mr. Kaplan's report and the opinions expressed therein severely taint his status as a qualified expert. The manner in which his expert report was prepared seriously undermines his ability to speak authoritatively about how power cords for submersible sump pumps should be safeguarded against misuse, or how his design safeguards against misuse. The flaws in his report preparation, the gratuitous nature of his services, and the minuscule amount of time expended in analysis, testing, and thought impact more than the weight to be given his testimony and opinions. They impinge upon his qualifications as an expert.

*Accordingly, it is adjudged, decreed, and ordered as follows:*

1. Plaintiff has failed to carry her burden in demonstrating that her expert, Mr. Gregory R. Kaplan, has the requisite knowledge, education, experience, or skill in any of the areas in which he purports to offer "expert" testimony. Consequently, he may not testify as an expert at trial.

2. "*Defendant's Motion To Bar The Testimony Of Greg Kaplan*" is hereby granted.

3. Pursuant to Rule 72(a) of the Federal Rules of Civil Procedure, the parties are given 10 days after being served with a copy of the Order to file exceptions thereto with The Honorable Ronald A. Guzman. Failure to file objections within the specified time period waives the right to appeal

---

**29.** *"Reply Brief In Support Of Defendant's Motion To Bar The Testimony Of Gregory Kaplan"*, at 725.

the Magistrate Judge's Order.[30]

*So Ordered.*

---

**30.** *Video Views, Inc. v. Studio 21, Ltd.,* 797 F.2d 538 (7th Cir.1986). *See also, Provident Bank v. Manor Steel Corporation,* 882 F.2d 258, 261 (7th Cir.1989) (when a matter has been referred to a Magistrate Judge, acting as a special master or § 636(b)(2) jurist, a party waives his right to appeal if he has not preserved the issues for appeal by first presenting them to the District Judge as objections to the Magistrate Judge's Order).