In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

Nos. 18-3034 & 18-3141

RICHARD A. CLARK,

*Plaintiff-Appellant, Cross-Appellee,*

*v.*

RIVER METALS RECYCLING, LLC,

*Defendant-Appellee, Cross-Appellant,*

and

SIERRA INTERNATIONAL MACHINERY, LLC,

*Defendant-Appellee.*

———————————

Appeals from the United States District Court for the
Southern District of Illinois.
No. 3:15-cv-00447-JPG-RJD — **J. Phil Gilbert**, *Judge.*

———————————

ARGUED APRIL 8, 2019 — DECIDED JULY 2, 2019

———————————

Before WOOD, *Chief Judge,* and SCUDDER and ST. EVE, *Circuit Judges.*

WOOD, *Chief Judge*. Accidents unfortunately happen on business premises with some regularity. The workers' compensation system normally governs payments from employers to injured workers, but those workers are free to sue other parties, such as suppliers or lessors of machinery that is used on the site. That is what happened here: Richard A. Clark was badly injured as he was getting off a car-crushing machine known as a mobile RB6000 Logger/Baler ("the Crusher"), which was used by his employer, Thornton Auto Crushing, LLC. He sued both the manufacturer of the Crusher, Sierra International Machinery, LLC, and the company that had leased it to Thornton, River Metals Recycling, LLC, asserting that they were liable to him under Illinois tort law because it was defectively designed. The district court granted summary judgment in both defendants' favor after it decided to strike the testimony from Clark's expert. Even taking the facts in the light most favorable to Clark, as we must, we conclude that the district court was correct to take this action. We therefore affirm its judgment.

## I

### A

Scrap cars eventually end up with a company such as Thornton, which crushes cars and sends what remains to a salvage company. One of the machines Thornton used to squash the cars was the Crusher. The Crusher had been assembled in Italy and then imported into the United States by Sierra. Sierra sold it to a company called Tri-State, which in turn conveyed it to River Metals through an asset-only purchase agreement. River Metals leased it to Thornton.

The Crusher was a rather large machine, as the picture of it that appears in the record shows:



Every other day or so for about 18 months before his accident, Clark had worked with this machine. He was responsible for daily maintenance, including checking the oil, antifreeze, and hydraulic fluids. In order to perform these tasks, he would clamber up the right side of the machine, stepping and grabbing onto whatever was handy: the hydraulic lines, a hose, or a cylinder, for example. This was not a method endorsed by Sierra: it recommended instead that workers use either a ladder or a working platform, such as a manlift or a forklift, to reach the tanks. When the time came to get down, Clark typically turned, stepped down from the tank-level platform (about 60 inches above the ground) onto the steel plate on top of the stabilizer (about 45 inches from the ground), and from there jumped the rest of the way.

On March 11, 2013, Clark finished his work up on the machine and attempted to dismount as usual. But this time he slipped, fell to the ground, and landed on his outstretched arm, shattering his elbow. He was taken to the Emergency Department at Carbondale Memorial Hospital; the Hospital recorded that "[a]s he was getting off the bailer [*sic*] apparently he slipped in some hydraulic fluid." Since the accident, Clark's left arm has been almost completely useless, and he has been in constant pain. He has not been able to work, despite an effort to return to Thornton.

## B

A little less than two years later, Clark filed a products-liability complaint against River Metals and Sierra in the Circuit Court of St. Clair County, Illinois. In it, he alleged that the Crusher was defective and unreasonably dangerous, because it failed to provide an adequate platform, handrails, or other area for performing routine maintenance. (Sierra named several third-party defendants, but the district court dismissed them, and they play no part in this appeal.) River Metals and Sierra removed the case to the U.S. District Court for the Southern District of Illinois on the basis of diversity jurisdiction, 28 U.S.C. § 1332(a)(1). After motion practice not relevant here, the district court granted summary judgment for both defendants on the ground that Clark could use only Illinois's risk-utility test for his defective-design theory, see *Calles v. Scripto-Tokai Corp.*, 224 Ill. 2d 247, 255–59 (2007), and that he had failed to present admissible expert evidence for that purpose.

The problem was not that Clark failed to present an expert: he did, in the person of Dr. James Blundell. Dr. Blundell has been a professor of mechanical engineering at the University

of Missouri for over 30 years, and he has published many peer-reviewed articles in that field. He opined that the Crusher should have had a ladder, toeboards, and guardrails. In support of those recommendations, he pointed to a standard published by the American National Standards Institute (ANSI) recommending that a ladder be available at the front platform of the machine for safe ascent and descent. This would have required an alteration of the front platform, but Dr. Blundell thought that this would be straightforward—it could be done by mimicking the cab end of the machine. He did not, however, develop this idea any further or provide any sketches as examples. That would have been difficult, Clark argues, because the defendants had refused to make their drawings or specifications for the machine available to him.

The district court found that Dr. Blundell's testimony did not satisfy the threshold criteria of Federal Rule of Evidence 702—in particular, the requirement that "the expert … reliably appl[y] the principles and methods to the facts of the case." FED. R. EVID. 702(d). It did so for several reasons. First, looking at Dr. Blundell's deposition, the court noted that "he repeatedly demonstrated … that he does not understand how to perform daily maintenance on the machine." Second, because Dr. Blundell had no alternative design to offer, the court thought that his opinion was "nothing more than a bare conclusion that adds nothing of value to the judicial process." See *Clark v. River Metals Recycling, LLC*, No. 3:15-cv-00447-JPG-RJD, 2018 WL 3108891, at *6 (S.D. Ill. June 25, 2018) (cleaned up) (quoting *McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 658 (7th Cir. 1998)). Third, Dr. Blundell eventually admitted that the ANSI standard to which he had pointed did not insist on a fixed ladder, as opposed to an external ladder. (Indeed,

that standard—as quoted in Dr. Blundell's report—is concerned with the need for railings, not ladders.) For all those reasons, the court struck Dr. Blundell's testimony. It also rejected Clark's last-ditch effort to rely on the testimony of Sierra's Service Tech Manager, Antonio Torres, in support of the defective-design theory. Taking that testimony in the light most favorable to Clark, Torres admitted that it would be feasible to put a ladder and a handrail *somewhere* on the front platform, but critically, Torres also said that there were "other ways" to provide a safe way of getting on and off the machine. *Id.* at *7. Those "other ways" were Sierra's designed and intended ways: an external ladder, forklift, or manlift.

Without admissible expert testimony, the district court held, Clark's suit could not survive. The court accordingly granted summary judgment for both defendants and dismissed all other claims. It also refused to allow Clark to amend his complaint to introduce a failure-to-warn theory. Such an 11th-hour amendment would gravely prejudice the defendants, the court concluded, and there was no justification for Clark's delay in raising the claim. Clark has appealed only from the summary judgment ruling, not from the denial of leave to amend.

## II

Clark's principal argument on appeal is that the district court erred in its treatment of Dr. Blundell, and more broadly in its decision that expert testimony was essential. He first contends that the court should have held a hearing before excluding Dr. Blundell's testimony. Second, he argues that expert testimony was not necessary to establish the "common-sense" point that a safety feature such as a built-in ladder had to be included in order to make the Crusher safe.

A

We consider *de novo* the question whether the district court properly applied the Rule 702 framework (often called the *Daubert* framework, after the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), which was largely codified in the Rule). *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 809 (7th Cir. 2012). In so doing, we bear in mind that the threshold inquiry "is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy." *Id.* at 805. If the district court has properly applied the Rule, our review of the decision to admit or exclude evidence is deferential. *Id.*

Turning first to the question of basic methodology, we find no error in the district court's application of Rule 702. The court summarized the Rule accurately and then turned to the task of applying it to Dr. Blundell's testimony. Our review of that application is only for abuse of discretion.

The district court's decision to exclude the testimony represented a reasonable assessment of the proposed evidence. It found Dr. Blundell's methodology to be unclear and conclusory, and we have no trouble following its thinking. We see no deficiency in the district court's decision about the necessity of a hearing, and so it committed no error when it resolved this issue without one. The report is just five pages long, including Dr. Blundell's discussion of the facts of the case, his description of the machine, and his recitation of the Operator's Manual. His analysis covers one page, in which he cited only an ANSI standard. The portion of that standard on which he relied states "Every open-sided floor or platform that is four feet or more above adjacent floor or ground level

shall be guarded by a railing system along all open sides, except where excluded as specified in 1.2 or where there is entrance to a ramp, stairway or fixed ladder." Because Clark was descending from a height of approximately five feet (59.75 inches), Dr. Blundell concluded that "a railing, a fixed ladder and a toe board should have been provided."

Brevity may be the soul of wit, but there is a difference between a complete but concise treatment of a subject and a failure to address the important points. There are several problems with Dr. Blundell's cursory statement. First, his paraphrase of the ANSI standard is not accurate. Although it does say that a railing is necessary, it says nothing about requiring a fixed ladder or a toeboard. Instead, it says that there should be an opening in a guard rail for a fixed ladder, and it is silent about toeboards. Indeed, Dr. Blundell did not even recommend, based on his own experience, that a toeboard and a fixed ladder should be added to a guardrail in order properly to protect maintenance workers.

The district court also criticized Dr. Blundell for his lack of knowledge of the Crusher machine. It is true that he could not readily identify where each type of maintenance occurred. On the other hand, no one contested the fact that Clark had to climb up and get down from the front area, and Dr. Blundell was well aware of that. But the lack of dispute over the critical area is at most one point in Dr. Blundell's favor, and it is not one that overrode the other deficiencies the district court noted. We thus conclude that the district court did not err when it excluded Dr. Blundell's proffered expert testimony.

B

Clark's back-up position is that the need for *some* safeguards on the Crusher was obvious enough that he should have been able to reach the jury without expert testimony. Recall that under Illinois law, a plaintiff bringing a strict-liability case based on a product defect must prove the following:

> (1) a condition of the product as a result of manufacturing or design, (2) that made the product unreasonably dangerous, (3) and that existed at the time the product left the defendant's control, and (4) an injury to the plaintiff, (5) that was proximately caused by the condition.

*Mikolajczyk v. Ford Motor Co.*, 231 Ill. 2d 516, 543 (2008), opinion modified on denial of reh'g (Dec. 18, 2008). The only element at issue in Clark's case is the second—whether the product was unreasonably dangerous. He bears the burden of proof. *Id.*

Illinois courts use two different approaches in order to decide whether something is unreasonably dangerous—the consumer-expectations test and the risk-utility test. *Id.* at 541. But if the evidence before the court implicates the risk-utility test, it is the one that the court should use, "because the latter [*i.e.* the consumer-expectations test] is incorporated into the former and is but one factor among many for the jury to consider." *Id.* at 556. The Illinois Supreme Court calls this an integrated test, and it has created a daunting list of at least 11 non-exclusive and non-dispositive factors that a factfinder might consider when applying it. We list a few of those factors to give the reader a feel for what is relevant:

(1) The usefulness and desirability of the product to the user and to the public at large;

(2) The likelihood that the product will cause injury, and if so, how serious that injury might be;

(3) The availability of substitutes that would meet the same need in a safer way;

(4) The feasibility for the manufacturer to eliminate the unsafe characteristics without either impairing utility or driving cost up too high;

(5) The user's ability to avoid danger by the exercise of care;

(6) The user's probable awareness of dangers inherent in the product, either through general public knowledge or suitable warnings or instructions;

(7) The manufacturer's ability to obtain liability insurance.

*Calles*, 224 Ill. 2d at 264–66.

Although it may seem obvious that a ladder was all that a maintenance worker would have needed in order safely to get up to the top of the Crusher and back down again, the question becomes more complex if we must decide how such a ladder might have been built into the machine. Just to say, as Sierra seems to concede, that it would be *possible* to attach a fixed ladder to the machine, does not tell us where the ladder should have gone, how expensive this design change would have been, or whether a ladder alone would be enough without guardrails and toeholds. We also know nothing about possible substitutes for the Crusher, or about the relative ease of obtaining liability insurance.

Illinois courts have recognized that "[p]roducts liability actions … often involve specialized knowledge or expertise outside the layman's knowledge" and so may require expert testimony. See *Baltus v. Weaver Div. of Kidde & Co.*, 199 Ill. App. 3d 821, 834 (1990); *Show v. Ford Motor Co.*, 659 F.3d 584, 585 (7th Cir. 2011) ("Several intermediate appellate decisions in Illinois say that expert testimony is vital in design-defect cases when aspects of a product's design or operation are outside the scope of lay knowledge."). We understand this to imply that there might be some products that are so simple that no expert is needed to tell people how to use them. Thus, for instance, in *Baltus* the Illinois Appellate Court observed that "if a chair is designed to be easily collapsible, for portability, but has the tendency to collapse when someone sits on it, an expert in chair design may not be needed to help the jury decide that the design is unreasonably dangerous; it does not function in the manner expected and is in fact unsafe." 199 Ill. App. 3d at 836. But we agree with the district court that the case before us is not one that can be resolved exclusively on the basis of common experience. Clark needed expert testimony for this critical element of his case (*i.e.* what design(s) would have been acceptable), and with Dr. Blundell's analysis excluded, he had none. Summary judgment for both defendants followed naturally.

### III

Before concluding, we add a few words about River Metals's cross-appeal. The first point to make is that it was unnecessary to file a formal cross-appeal. River Metals is simply offering an alternate ground to support the district court's judgment in its favor; it has no desire to change that judgment. In the district court, it moved for dismissal on the ground

(among others) that it was a non-manufacturer defendant for purposes of 735 ILCS 5/2-621. See also *id.* 5/2-621(b), (c) (requiring dismissal of a non-manufacturer defendant once the manufacturer has "been required to answer or otherwise plead" unless the plaintiff establishes certain exceptions). The district court denied the motion because it thought that River Metals raised this defense too late—more than two years after filing the answer, and several months after moving for summary judgment.

This may have been erroneous. Illinois courts focus only on the establishment of the manufacturer's identity "in a timely fashion" and the lack of prejudice for a plaintiff. *Cherry v. Siemans Med. Sys., Inc.*, 206 Ill. App. 3d 1055, 1061 (1990). But we do not need to resolve this dispute in light of our decision that both defendants were entitled to summary judgment on the merits. We also have no need to address River Metals's arguments that, as a lessor of a used product, it was not a company that could be strictly liable for design defects, and that its liability was precluded by the terms of the agreement pursuant to which it bought the assets of Tri-State, the original purchaser from Sierra.

## IV

It is always regrettable when a person is injured on the job, especially when it seems from a layperson's standpoint that a relatively easy measure might have prevented the injury. But that does not mean that every possible defendant is always liable. Clark sued the manufacturer and lessor of the machine on which he had been working, but under Illinois law, he needed expert testimony to pin down exactly why the machine was designed in a defective way. The district court did

not abuse its discretion in excluding the only expert testimony that he had, and so its judgment must be AFFIRMED.