In the

# United States Court of Appeals

## For the Seventh Circuit

No. 20-2983

TYLER KIRK and MELISSA KIRK,

*Plaintiffs-Appellants*,

*v.*

CLARK EQUIPMENT COMPANY,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Western Division.
No. 17-cv-50144 — **John Robert Blakey**, *Judge*.

ARGUED FEBRUARY 24, 2021 — DECIDED MARCH 25, 2021

Before FLAUM, MANION, and KANNE, *Circuit Judges*.

FLAUM, *Circuit Judge*. Tyler Kirk suffered severe injuries to his right lower leg, foot, and ankle when the skid-steer loader he was operating for his employer tipped over. He and his wife, Melissa Kirk (collectively, the "Kirks"), brought a strict-liability action against the loader's manufacturer, defendant-appellee Clark Equipment Company, alleging a design defect and loss of consortium. The district court granted Clark's motions to exclude the testimony of the Kirks' expert and for

summary judgment. The Kirks appealed the district court's order. We now affirm.

## I. Background

### A. Tyler Kirk's Accident

Tyler Kirk began working at Sterling Steel Company ("Sterling") in 2014. Sterling employed Kirk at its factory in Sterling, Illinois. As part of his work duties, Kirk operated the Bobcat Model S130 Skid-Steer Loader at issue in this suit (the "Loader"). The Loader is a small, compact, and maneuverable wheeled front-end loader. It is primarily used for earthmoving, including digging, carrying, and dumping loose materials with a bucket attachment. Sterling purchased the Loader new in 2008 from a local dealership, rather than directly from Clark. At the time of Kirk's accident, it was equipped with a sixty-two-inch bucket attachment, solid-rubber tires, rear-axle counterweights, and a heavy rear-light guard that was attached post sale. These components increased the Loader's rated operating capacity ("ROC")—the maximum load the Loader can carry safely and stably—to 1,420 lbs.

Kirk regularly used the Loader to clean under roll lines at the factory. He scooped up steel scale, a byproduct of the steel casting process, from the factory's lower level and moved it up a concrete ramp with approximately a thirty-degree incline. Other Sterling employees used the Loader to perform the same task, and the record indicates that no significant accidents involving the Loader occurred prior to Kirk's accident.

Kirk's injuries occurred on May 12, 2015, when he operated the Loader to move steel scale from the lower level to the waste pile on the main level. After scraping the scale material

from the floor into the bucket, he drove the Loader up the ramp and approached the waste pile. Kirk asserts that the Loader began to wobble and tip forward as he raised the Loader's lift arms, which held the bucket, to dump the scale on the pile. In an effort to stabilize himself, Kirk braced his right foot on the console near the front opening of the Loader's operator cab. His foot slipped out the front of the cab, and he brought the lift-arm cross-member down on it, crushing his foot between the cross-member and the forward structure of the operator cab. Kirk suffered serious injuries to his foot and ankle, requiring multiple surgeries and pro-longed hospitalization and resulting in permanent right leg disability, loss of his job, and medical expenses totaling $433,000.

Kirk testified that no one else witnessed his accident; therefore, the details of the accident come from his account. He testified that he did not know "how full the bucket was or how the load looked" at the time of the accident, other than that it did not look unusually large. He stated that as he ap-proached the waste pile, he raised the bucket to about chest height, he could see beneath the bucket, and the load may have extended over the top of the bucket.

### B.  Procedural Background

The Kirks filed a two-count complaint against Clark, alleg-ing that Clark was strictly liable for Tyler Kirk's injuries and for Melissa Kirk's loss of consortium. They alleged that the Loader that Clark manufactured and sold to Sterling was in a dangerous, unsafe, and defective condition for its foreseeable use because the Loader had a propensity to tip forward when a sixty-two-inch bucket was used to carry a heavy, dense load such as steel scale. In bringing their claims, the Kirks invoked

theories under Illinois law known as the consumer expectations test and the risk-utility test. Clark responded by filing a third-party complaint against Sterling for contribution or indemnity.

The Kirks retained only one expert witness: Daniel Pacheco. Pacheco has been employed in engineering positions since 1964 and licensed as a professional engineer since 1970. Pacheco, as President of Polytechnic, Inc., since 1989, provides forensic engineering analyses of mechanical engineering issues, including evaluation of the design and implementation of material-handling equipment.

In his expert report, Pacheco rendered opinions on design flaw and causation. Regarding design, he opined that the Loader was "unreasonably dangerous for its intended and foreseeable use because it had the innate propensity to not perform as the consumer/operator would expect." He also stated his opinion that the Loader's "design providing for the use of the [sixty-two-inch low-profile] bucket … made it highly likely, if not certain, that the bucket would be loaded in excess of the loader's Rated Operating Capacity of 1300/1400 lbs." He contended that limiting the bucket to a fifty-four-inch capacity "would have prevented exceeding the Rated Operating Capacity … and prevented the tip forward at the time of Mr. Kirk's injury."

Regarding causation, Pacheco opined that the "unreasonably dangerous condition" of the Loader equipped with the sixty-two inch bucket "directly contributed to cause the leg injury suffered by Tyler Kirk because the sudden tip forward resulted in Mr. Kirk's proper attempt to lower the bucket while his leg was instinctively and inadvertently positioned

in the zone where it was crushed between the descending lift arm cross member and loader frame."

At the close of discovery, Clark moved to exclude Pacheco's testimony and for summary judgment. Clark argued that Pacheco's proffered opinions did not meet the standards for admissibility under Federal Rule of Evidence 702. It further argued that without his testimony or the testimony of another expert, the Kirks could not prove the essential elements of their claims. The district court granted both motions, concluding that Pacheco's opinions did not meet the standards laid out in Rule 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The district court dismissed Clark's third-party complaint against Sterling as moot.[1] The Kirks then appealed.

## II.    Discussion

On appeal, the Kirks challenge the district court's granting of Clark's motions to exclude and for summary judgment. We begin our analysis with the motion to exclude before proceeding to the summary judgment motion.

### A.  Exclusion of Pacheco's Testimony

The Kirks first appeal the exclusion of Pacheco's testimony. Rule 702 and *Daubert* govern the admissibility of expert testimony. *Haley v. Kolbe & Kolbe Millwork Co.*, 863 F.3d 600, 611 (7th Cir. 2017). Rule 702 provides that a witness "qualified as an expert by knowledge, skill, experience, training, or education may testify" if:

---

[1] Sterling is not a party on appeal.

(a) the expert's scientific, technical, or other spe-
cialized knowledge will help the trier of fact to
understand the evidence or to determine a fact
in issue;

(b) the testimony is based on sufficient facts or
data;

(c) the testimony is the product of reliable prin-
ciples and methods; and

(d) the expert has reliably applied the principles
and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert*, the Supreme Court explained that Rule 702
confides to the district court a gatekeeping responsibility to
ensure that the proposed expert testimony "is not only rele-
vant, but reliable." 509 U.S. at 589. In performing this role, the
district court must engage in a three-step analysis, evaluating:
"(1) the proffered expert's qualifications; (2) the reliability of
the expert's methodology; and (3) the relevance of the ex-
pert's testimony." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d
771, 779 (7th Cir. 2017) (emphasis omitted). Clark challenged,
and the district court's order addressed, only the second
step—the reliability of Pacheco's testimony.

When, as here, a party challenges a district court's exclu-
sion of an expert, our review proceeds in two steps. *Timm v.
Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 993–94 (7th
Cir. 2019). "We review de novo whether a district judge has
followed Rule 702 and *Daubert*." *Haley*, 863 F.3d at 611. If the
court correctly "applied the Rule 702/*Daubert* framework, we
review [its] decision to admit or exclude expert testimony for
abuse of discretion." *Id.* Under that standard, "[s]o long as the

district court adhered to *Daubert*'s requirements, we shall not 'disturb the district court's findings unless they are manifestly erroneous.'" *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607–08 (7th Cir. 2006) (citation omitted). If, however, "the district court failed to conduct a *Daubert* analysis, then we review *de novo* whether the expert's testimony was admissible under Federal Rule of Evidence 702." *United States v. Adame*, 827 F.3d 637, 645 (7th Cir. 2016).

### 1. *Applicable Standard of Review*

We conclude that the district court adequately performed the *Daubert* analysis. "To apply the proper legal standard, 'judges merely need to follow *Daubert* in making a Rule 702 determination.'" *Gopalratnam*, 877 F.3d at 782 (quoting *Naeem*, 444 F.3d at 608). A court, however, "must provide more than just conclusory statements of admissibility or inadmissibility to show that it adequately performed its gatekeeping function." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010).

Here, the district court expressly recognized that "Federal Rule of Evidence 702 and … *Daubert* … govern the admissibility of expert testimony." The district court "prefaced its *Daubert* analysis with a … discussion of the applicable test, which highlighted *Daubert*'s dual focus on relevance and reliability, including the most commonly utilized reliability factors." *See Gopalratnam*, 877 F.3d at 783. It also emphasized that its analysis must focus on the principles and methodologies underlying the expert's conclusions. The district court proceeded to apply the *Daubert* factors to Pacheco's methods and analysis. "All told, such an inquiry stands in stark contrast to [the] cases" cited by the Kirks in which we concluded that the district court did not adhere to the *Daubert* framework. *See id.* For example, in *Metavante Corp. v. Emigrant Savings Bank*,

619 F.3d 748 (7th Cir. 2010), we applied de novo review when the court "failed to perform a *Daubert* analysis" and articulated only a one-sentence conclusion. *Id.* at 760; *see also Naeem,* 444 F.3d at 608 (declining to apply deferential review when district court provided no analysis of methodology in its one-sentence determination). Similarly, we refused to defer to conclusory *Daubert* determinations in *Baugh v. Cuprum S.A. de C.V.,* 845 F.3d 838, 844 (7th Cir. 2017), and *Fuesting v. Zimmer, Inc.,* 421 F.3d 528, 534–35 (7th Cir. 2005), *vacated in part on other grounds,* 448 F.3d 936 (7th Cir. 2006). The district court's analysis here, although concise, is much more thorough than these conclusory determinations. "Thus, we will apply an abuse of discretion standard to our review of the court's ultimate determination to exclude [Pacheco's] testimony." *Gopalratnam,* 877 F.3d at 783.

### 2.  *The District Court's Reliability Determination*

Proceeding to the district court's reliability determination, we see no abuse of discretion in the exclusion of Pacheco's testimony. In analyzing this determination, the relevant "question is not whether we would have admitted [Pacheco's] testimony in the first instance; the relevant inquiry is whether any 'reasonable person would agree with the decision made by the trial court.'" *Id.* at 788 (quoting *Smith v. Hunt,* 707 F.3d 803, 808 (7th Cir. 2013)).

When evaluating the reliability of expert testimony, the district court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert,* 509 U.S. at 592–93. A court may consider the following non-exhaustive list of factors:

> (1) [W]hether the particular scientific theory "can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3) the "known or potential rate of error"; (4) the "existence and maintenance of standards controlling the technique's operation"; and (5) whether the technique has achieved "general acceptance" in the relevant scientific or expert community.

*Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 505 (7th Cir. 2003) (quoting *Daubert*, 509 U.S. at 593–94). "No one factor is dispositive, however, and 'the Supreme Court has repeatedly emphasized [that] the Rule 702 test is a flexible one.'" *Timm*, 932 F.3d at 993 (alteration in original) (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000)). In addition, "the correct inquiry focuses not on 'the ultimate correctness of the expert's conclusions,' but rather on 'the soundness and care with which the expert arrived at her opinion.'" *Id.* (quoting *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013)).

As an initial matter, the Kirks assert that the district court conducted a flawed *Daubert* analysis by neglecting to address Pacheco's qualifications. Although an expert's qualifications represent the first prong of the required three-prong *Daubert* inquiry, *see Gopalratnam*, 877 F.3d at 779, neither Clark nor the district court questioned Pacheco's qualifications. The Kirks nonetheless dedicate a substantial portion of their briefing on appeal to arguing that Pacheco is qualified to offer expert opinions. To the extent that they assert that Pacheco's qualifications alone render his testimony admissible, that argument misreads our precedent.

A court's determination that an expert possesses the requisite qualifications does not, without more, provide a sufficient basis for admissibility. *See Ford Motor Co.*, 215 F.3d at 718 ("A court's reliability analysis does not end with its conclusion that an expert is qualified to testify about a given matter."). We have underscored that "[e]ven '[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method.'" *Id.* (some alterations in original) (quoting *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999)). The district court cases the Kirks cite in their briefing do not indicate otherwise; in those cases, the district courts determined whether to admit or exclude expert testimony by considering several factors, only one of which was the expert's qualifications. *See Schuring v. Cottrell, Inc.*, 244 F. Supp. 3d 721, 728–32 (N.D. Ill. 2017); *Hasan v. Cottrell, Inc.*, No. 10 C 5534, 2014 WL 4124254, at *3–7 (N.D. Ill. Aug. 21, 2014); *Traharne v. Wayne/Scott Fetzer Co.*, 156 F. Supp. 2d 697, 703–17 (N.D. Ill.), *aff'd and adopted*, 156 F. Supp. 2d 717 (N.D. Ill. 2001); *Lichter v. Case Corp.*, No. 99 C 4260, 2001 WL 290615, at *2–3 (N.D. Ill. Mar. 20, 2001); *Moncrieffe v. Clark Equip. Co.*, No. 06-22644-CIV, 2008 WL 11333222, at *6–10 (S.D. Fla. July 23, 2008). That process of analysis accords with *Daubert*'s instructions. The district court here thus appropriately proceeded to the reliability determination, and we now also address each of Pacheco's proffered opinions in turn.

### a. Pacheco's defective condition opinion

Pacheco first opined that the Loader was defective only if equipped with a sixty-two-inch bucket because the size of the bucket allows it to carry a load so heavy that it causes the Loader to tip over. The district court excluded this opinion as

unreliable. On appeal, the Kirks argue that the district court erred by overlooking Pacheco's citation to and reliance on various industry standards and publications, Clark's own testing data, and additional testimony.

We disagree; the district court's finding was within its discretion. Pacheco's conclusion that the Loader had a design defect when equipped with a sixty-two-inch bucket hinged on a load weight in the bucket exceeding the ROC. Based on his own calculations and those of a Sterling engineer regarding the density of steel scale and the volume of the sixty-two-inch bucket filled both to the "struck" line (level with the sides of the bucket) and to a "heaped" capacity (above the sides), Pacheco opined that it was "highly likely" that a heaped load of steel scale in a sixty-two-inch bucket would exceed the Loader's ROC, while a struck load would not. He then concluded that a heaped load, in conjunction with the Loader's short wheelbase, would cause a propensity for the Loader to tip forward.

The district court, however, considered and found unreliable the evidence Pacheco cited to support his opinion that the Loader had a design defect. The district court made clear that it reviewed and analyzed Pacheco's report and deposition testimony, both of which set out and explained the bases for and methodologies underlying his conclusions—as the Kirks admit. It emphasized the absence of data from similar accidents, generally accepted industry standards, and peer review to support Pacheco's conclusion. Pacheco had never used a skid-steer loader (let alone the Loader in question) with a bucket attachment to pick up and move materials nor had he ever operated a skid-steer loader at full operating capacity or tipped a skid-steer loader forward. Thus, Pacheco

did not test his design defect theory on either the Loader or any similar loaders or equipment. The court accordingly found that the only identifiable source for Pacheco's opinion that a defect existed was his own speculation. While terse, the district court's analysis tracked the *Daubert* factors and found that they weighed against admissibility.

The Kirks also argue that the district court overlooked additional evidence, but that evidence still would not provide sufficient support to overcome the shortcomings in Pacheco's opinion. First, the Kirks point to the deposition testimony of Marvin Smith, a co-worker of Tyler Kirk's, and Robert Merema, an employee at one of Clark's distributors. The admissibility (and probative value) of this testimony is doubtful because neither Smith nor Merema witnessed the accident or provided any indication that they had experienced substantially similar accidents. *See Nachtsheim v. Beech Aircraft Corp.*, 847 F.2d 1261, 1268 (7th Cir. 1988) (explaining the "foundational requirement" in product liability cases that "the proponent of similar accidents evidence must establish substantial similarity before the evidence will be admitted" is of particular importance when the evidence is proffered to show "the existence of a dangerous condition or causation"). Smith testified that he experienced bouncing while operating the Loader with full loads; he did not testify that he tipped over while operating the Loader, or that he had maneuvered a similar load as Kirk. Merema testified that he was aware of a general trend of all skid-steer loaders to tip forward, but he specifically disclaimed any personal knowledge of or experience with other tipping or bouncing incidents.

Second, the Kirks point to the evidence of Sterling's subsequent remedial measure of replacing the sixty-two-inch

bucket with a fifty-four-inch bucket. This evidence is inadmissible under Federal Rule of Evidence 407, which prohibits the admission of evidence of subsequent remedial measures to show culpability. *See Traylor v. Husqvarna Motor*, 988 F.2d 729, 733 (7th Cir. 1993).

Finally, the Kirks point to industry literature that Pacheco relied on in his report and testimony. That literature is irrelevant because it simply states the general fact that "forward tipping of skid steer loaders … has been one of the most frequent causes of injury and death from use of such equipment" and advises on safe operating procedures to reduce the risk of tipping. Pacheco did not state that this literature specifically addresses the Loader at issue here or whether equipping it with a sixty-two-inch bucket renders the Loader defective.

The evidence highlighted by the Kirks thus does not clearly support the reliability of Pacheco's opinion that the Loader was unreasonably dangerous when equipped with a sixty-two-inch bucket. We therefore conclude that the district court's decision to exclude Pacheco's opinion regarding the purported defect was not manifestly erroneous.

### b. Pacheco's causation opinion

Pacheco also opined that the unreasonably dangerous condition of the Loader equipped with the sixty-two-inch bucket directly contributed to Tyler Kirk's injuries. The district court similarly excluded this opinion as unreliable. It found that an "analytical gap exists between the fact that overloaded buckets on skid-steer loaders *can* cause a loader to tip and the conclusion that *this particular* Loader's 62-inch bucket *caused* the overloading and subsequent tipping in this instance." The court found that Pacheco did not know the

weight of the Loader's bucket at the time of the accident, let alone whether it exceeded the ROC, and that he performed no testing on the Loader or a similar loader to confirm his causation theory. It also emphasized the absence of evidence of peer review or general acceptance of the theory. Finally, the district court found that Pacheco's analysis did not account for "obvious potential alternative causes." The Kirks contend that the record refutes each of these findings.

We again conclude that the district court acted within its discretion. Pacheco's opinion that an overloaded bucket caused the Loader to tip, injuring Tyler Kirk, rests on his speculation that the weight of the load exceeded the ROC. Yet, by his own admission, Pacheco did not know the weight of the load in the bucket at the time of the accident and could not say whether it exceeded the ROC.

The Kirks maintain that the inability to determine the exact weight of the load does not render Pacheco's opinion inadmissible because his opinion still represents a reasonable judgment based on the knowable facts regarding the amount and weight of scale in the bucket. This contention is unavailing. First, it appears that Pacheco based his assumption that the weight of the load exceeded the ROC on a mischaracterization of Tyler Kirk's testimony. Pacheco stated that Kirk testified that "the bucket was full and that the machine began to tip." In fact, Kirk testified that the load "didn't look unusually large," but it was "possible" that the load extended over the top of the bucket. *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 896 (7th Cir. 2011) (explaining that district court may assess whether it "'was appropriate for [an expert] to rely on the test that he administered and upon the sources of information which he employed'" (citation omitted)). For his own part,

Pacheco gave contradictory testimony about whether the load remaining in the bucket post-accident appeared "heaping."

Second, the Kirks' argument that Pacheco appropriately calculated the load's weight using the bucket's dimensions fares no better because of the scale material's irregularity. We have acknowledged that an expert may sometimes draw a conclusion based on only their "extensive and specialized experience." *See id.* (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999)). An expert, however, must "substantiate his opinion," rather than assume it to be true. *See Takata Corp.*, 192 F.3d at 757 (quoting *Huey v. United Parcel Serv., Inc.*, 165 F.3d 1084, 1087 (7th Cir. 1999)). Here, Tyler Kirk testified that no two loads of steel scale fit the same in the bucket because "[steel scale is] an irregular material" with respect to its shape, and Merema, the Clark distributor employee, testified that "[y]ou'd almost have to … go over a scale with" the Loader to determine the weight in the bucket. That testimony undercuts the reliability of Pacheco's calculations based on generic evidence. Indeed, Pacheco even conceded that, while not expected, it would have been possible for Kirk to tip the Loader forward with a load in the bucket weighing at or below the ROC.

More generally, Pacheco's testimony provided ample reason to question the "soundness and care" with which he arrived at his opinion on causation. *See Schultz*, 721 F.3d at 431. He did not view, inspect, or operate the Loader in person. He never visited the Sterling factory or inspected the accident site beyond photographs. He did not interview Tyler Kirk, the only eyewitness to the accident and only person with knowledge of how it occurred. He testified that he did not know Kirk's speed at the time of the accident, other than in

imprecise terms. Finally, Pacheco testified that none of his opinions have been peer-reviewed.

The district court also did not err in concluding that Pacheco did not rule out any serious alternative causes. Although Pacheco opined that Kirk operated the Loader in a manner consistent with the training and operating manuals provided by Clark—and that his opinion was corroborated by Clark's expert—Pacheco testified that he could not "point to any specific" reason why Kirk's operation of the Loader did not contribute to causing the accident. Pacheco also conceded that in addition to not knowing Kirk's speed at the time of the accident, he could not conclusively state whether Kirk had cleared the ramp before the accident and did not verify the grade of the ramp. Moreover, Pacheco did not address the fact that no other similar accidents involving the Loader occurred over the seven years preceding Kirk's accident. Pacheco's failure to account for and investigate potential alternative causes lends additional support to the district court's reliability determination. *See, e.g.*, *Gopalratnam*, 877 F.3d at 787 (affirming exclusion of expert in part because he "failed to account for other possible explanations in arriving at his conclusion"); *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 774 (7th Cir. 2014) (affirming exclusion of expert for failing to investigate and rule out any serious alternative causes).

The Kirks advance several arguments in support of the admissibility of Pacheco's causation opinion. First, they argue that the question of causation constitutes an ultimate question of fact that a jury, not the court, should resolve. Therefore, they contend that the fact that Pacheco based his opinion on evidence supporting his opinion suffices to clear the *Daubert* threshold. "The purpose of *Daubert*," however, "was to

require courts to serve as gatekeepers so that unreliable expert testimony does not carry too much weight with the jury." *United States v. Ozuna*, 561 F.3d 728, 737 (7th Cir. 2009). At the *Daubert* phase, then, "[t]he ultimate question is whether the expert's approach is scientifically valid." *Kopplin v. Wis. Cent. Ltd.*, 914 F.3d 1099, 1103–04 (7th Cir. 2019). "The focus is on the expert's methodology, not his ultimate conclusions." *Id.* at 1104. Here, the district court concluded that Pacheco's proffered testimony regarding his methodology, which bears on an ultimate question of fact, lacked sufficient indicia of reliability. Accordingly, it was appropriate for the court to exclude that testimony. *See Daubert*, 509 U.S. at 595 (explaining that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it" (citation omitted)).

Second, the Kirks suggest that Pacheco did not need to test his opinions because Sterling replaced the sixty-two-inch bucket with a smaller bucket after the accident. They first assert that inspection or testing of the Loader "would provide no relevant information." This blanket assertion, however, is belied by precedent and the facts of the case. While absence of testing represents only one factor in the *Daubert* analysis, when combined with the lack of other supporting data or peer review, it may weigh against a finding of reliability. Furthermore, relevant to a case based on an alleged design defect in the Loader, inspection and testing of the Loader may very well have provided Pacheco with additional, valuable information in forming his causation opinion.

Third, the Kirks argue that testing should not be required when it would be fruitless or impossible. We do not require experts to accomplish the impossible or to use cost-prohibitive methods. *See id.* at 593 ("[A] key question to be answered

in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it *can be* (and has been) tested." (emphasis added)); *see also McCloud ex rel. Hall v. Goodyear Dunlop Tires N. Am., Ltd.*, 479 F. Supp. 2d 882, 892 (C.D. Ill. 2007) ("To meet the testing factor required by *Daubert* an expert does not need to perform the best conceivable test. Instead, the question is whether valid scientific testing was performed."). Here, however, the Kirks did not provide sufficient support for their conclusory argument that they could not recreate the conditions of Tyler Kirk's accident. The district court thus did not abuse its discretion in declining to credit that argument.

In sum, based on the facts in the record, we conclude that the district court did not abuse its discretion in excluding Pacheco's causation opinion.

### B.  Summary Judgment

The Kirks also appeal the district court's grant of summary judgment for Clark. We review de novo a district court's order granting summary judgment. *See Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). "Summary judgment is appropriate when there is no genuine dispute as to a material fact and the movant is entitled to judgment as a matter of law." *Estate of Jones v. Child.'s Hosp. & Health Sys. Inc. Pension Plan*, 892 F.3d 919, 923 (7th Cir. 2018).

The district court here concluded that Pacheco's exclusion doomed the Kirks' claims under Illinois strict-liability law. That law requires a plaintiff to prove "(1) a condition of the product as a result of manufacturing or design, (2) that made the product unreasonably dangerous, (3) and that existed at the time the product left the defendant's control, and (4) an

injury to the plaintiff, (5) that was proximately caused by the condition." *Clark v. River Metals Recycling, LLC*, 929 F.3d 434, 439 (7th Cir. 2019) (quoting *Mikolajczyk v. Ford Motor Co.*, 901 N.E.2d 329, 345 (Ill.), *opinion modified on denial of reh'g* (Ill. 2008)). The district court determined that without Pacheco's testimony, the Kirks failed to raise a triable issue on the first and fifth elements—an unreasonably dangerous design and causation. The Kirks assert on appeal that they raised sufficient questions of material fact to submit this case to a jury even without expert testimony.

Our review begins and ends with design defect. In Illinois, a plaintiff may establish a design defect through two different approaches: "the consumer-expectations test and the risk-utility test." *Id.* "But if the evidence before the court implicates the risk-utility test, it is the one that the court should use, 'because the latter [*i.e.* the consumer-expectations test] is incorporated into the former and is but one factor among many for the jury to consider.'" *Id.* (alteration in original) (quoting *Mikolajczyk*, 901 N.E.2d at 352).

In addition, Illinois courts recognize that "[p]roducts liability actions … often involve specialized knowledge or expertise outside the layman's knowledge" and so may require expert testimony. *See Baltus v. Weaver Div. of Kidde & Co.*, 557 N.E.2d 580, 588–89 (Ill. App. Ct. 1990); *see also Show v. Ford Motor Co.*, 659 F.3d 584, 585 (7th Cir. 2011) ("Several intermediate appellate decisions in Illinois say that expert testimony is vital in design-defect suits when aspects of a product's design or operation are outside the scope of lay knowledge."). Accordingly, while "there might be some products that are so simple that no expert is needed to tell people how to use them," cases involving specialized or complex products

"can[not] be resolved exclusively on the basis of common experience" and require "expert testimony for this critical element of [a plaintiff's] case (*i.e.* what design(s) would have been acceptable)." *River Metals*, 929 F.3d at 440.

In this case, the district court concluded that "the Loader is not a simple product that lay jurors commonly see or use, but a specialized piece of industrial equipment that falls outside of a juror's common understanding and experiences." We agree with that finding, which is supported by relevant precedent. *See, e.g.*, *id.* (affirming summary judgment when plaintiff lacked expert testimony on whether a car crusher had an unreasonably defective design that caused plaintiff's slip-and-fall injury); *Show*, 659 F.3d at 588 (affirming summary judgment when plaintiff lacked expert testimony regarding whether car had a design defect that rendered it unstable and caused it to roll over); *Henry v. Panasonic Factory Automation Co.*, 917 N.E.2d 1086, 1092 (Ill. App. Ct. 2009) (affirming summary judgment when plaintiff lacked expert testimony on whether an industrial machine was unreasonably dangerous); *Fulton v. Theradyne Corp.*, No. 06 C 1321, 2007 WL 772953, at *4 (N.D. Ill. Mar. 12, 2007) (granting summary judgment on design defect claim when the plaintiff failed to present admissible expert evidence regarding the design of a medical device); *cf. River Metals*, 929 F.3d at 440 (noting that a product such as a chair might be "so simple" such that expert testimony is unnecessary to explain to a jury why its design renders it unreasonably dangerous).

Because we agree that this product lies outside the layperson's expertise, the Kirks needed expert testimony to prove that the Loader's design rendered it unreasonably dangerous. The district court, however, did not abuse its discretion in excluding Pacheco, the Kirks' only expert. The Kirks thus lack evidence to prove their product-liability allegations based on

a strict-liability theory. Accordingly, we conclude that the district court appropriately granted summary judgment. *See River Metals*, 929 F.3d at 440 ("[T]he case before us is not one that can be resolved exclusively on the basis of common experience. [The plaintiff] needed expert testimony for this critical element of his case (*i.e.* what design(s) would have been acceptable), and with [the proposed expert's] analysis excluded, he had none. Summary judgment … followed naturally.").

The Kirks argue that they can prove design defect under the consumer-expectations test without expert testimony because an ordinary consumer could determine what caused the Loader to tip. This argument overlooks the fact that we have previously rejected the contention that "jurors, as consumers, can find in their own experience all of the evidence required for liability under the [Illinois] consumer-expectation approach." *Show*, 659 F.3d at 585. We concluded that if "it takes expert evidence to establish a complex product's unreasonable dangerousness through a risk-utility approach, it also takes expert evidence to establish a complex product's unreasonable dangerousness through a consumer-expectations approach." *Id.* at 587. "Because consumer expectations are just one factor in the inquiry whether a product is unreasonably dangerous, a jury unassisted by expert testimony would have to rely on speculation." *Id.* at 588. Accordingly, the Kirks' lack of admissible expert testimony to prove that a design defect in the Loader rendered it unreasonably dangerous is fatal to their suit under either the consumer-expectations or risk-utility theory.

### III.     Conclusion

For the reasons explained above, we AFFIRM the district court's order granting Clark's motion to exclude Pacheco's testimony and entering summary judgment for Clark.